**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| E.W., *a minor, by her parent and natural Guardian, M.B.*, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 5:25-cv-2904 |
| | : | |
| WILSON SCHOOL DISTRICT, | : | |
| Defendant. | : | |

**O P I N I O N**
**Defendant's Motion for Summary Judgment, ECF No. 11 – Granted**
**Plaintiff's Motion for Judgment on the Administrative Record, ECF No. 14 – Denied**

**Joseph F. Leeson, Jr.**                                               **February 17, 2026**
**United States District Judge**

## I.     INTRODUCTION

Plaintiff, E.W., by her parent and natural Guardian, M.B. ("Parent"), is a twelve-year-old middle school student with Down syndrome and Attention Deficit Hyperactivity Disorder. She attends school in the Wilson School District. Parent argues that the District did not provide E.W. with a free, appropriate public education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA"), Section 504 of the Rehabilitation Act ("Section 504"), the Americans with Disabilities Act ("ADA"), and the Pennsylvania special education regulations. Parent brought a due process complaint alleging violations of the IDEA, Section 504, and the ADA, and seeking a hearing before a Pennsylvania Special Education Hearing Officer. The Hearing Officer entered a decision in favor of the District and against Parent on all claims. Parent thereafter filed a Complaint before this Court. Before the Court are the District's Motion for Summary Judgment and Parent's Motion for Judgment on the Administrative Record. For the reasons set forth below, the Court grants the District's Motion and denies Parent's Motion.

## II.   BACKGROUND

### A.  Factual Background

E.W. is a twelve-year-old resident of the Wilson School District who attends Wilson West Middle School. *See* Hearing Officer Findings of Fact ("F.F. ¶ __") ¶ 1, ECF No. 16-3.[1] E.W. qualifies for special education because she has an Intellectual Disability and a Speech and Language Impairment. *See id.* ¶ 2. She has Down syndrome and attention-deficit hyperactivity disorder ("ADHD"). *See id.* ¶ 3. E.W.'s parents share legal custody, but her mother, M.B. ("Parent") has sole decision-making authority regarding E.W.'s education. *See id.* ¶ 4.

### 1.  2018-19 School Year (Kindergarten)

For the 2018-19 school year, E.W. "received itinerant life skills support, speech, and occupational therapy" and "spent 97% of the day in general education with no pull-out special education support." *Id.* ¶ 6. E.W.'s "Stanford-Binet V yielded a full-scale IQ of 48, and the Vineland-3 indicated deficits in adaptive behavior. Achievement testing (WJ-IV) showed significantly below-average scores across all areas." *See id.* ¶ 7. The District "confirmed [E.W.'s] eligibility for special education and recommended an [Individualized Education Plan ("IEP")] targeting pre-academic skills, expressive/receptive language, articulation, adaptive behavior, social skills, and behavior." *Id.* ¶ 8.

### 2.  2020-21 School Year (Second Grade)

In 2020, the District completed a Functional Behavioral Assessment ("FBA") of E.W. *Id.* ¶ 9; *see also* Ex. S-19, ECF No. 16-11.[2] The FBA identified six behaviors of concern: refusals,

---

[1]   The Court accords "due weight" to the Hearing Officer's Findings of Fact and accepts them as "*prima facie* correct." *Montgomery Cnty. Intermediate Unit No. 23 v. A.F. ex rel. D.F.*, 506 F. Supp. 3d 293, 302–03 (E.D. Pa. 2020) (citation omitted).

[2]   All of the District's exhibits are located at ECF No. 16-11 and are marked "S-__." All of Parent's exhibits are located at ECF No. 16-12 and are marked "P-__."

eloping, tantrum, property destruction, aggression, and self-injurious. *See* Ex. S-19 at 6. The District also added a positive behavior support plan ("PBSP") to the IEP. *See* F.F. ¶ 9. In January 2021, "the District proposed a reevaluation including updated ability, achievement, speech, and fine motor assessments, but in-person testing did not occur due to parental health concerns." *Id.* ¶ 11. The District completed remote assessments, consisting of "completed parent and teacher rating scales, conducted remote observations, and performed a remote assistive technology evaluation." *Id.* ¶ 12; *see also* Ex. S-4 at 12–14; Defendant's Statement of Undisputed Material Facts ¶ 12 ("Def. SUMF"), ECF No. 11-1.

### 3. 2021-22 School Year (Third Grade)

In November 2021, the District sought to reevaluate E.W. *Id.* ¶ 14. The District sent three requests to Parent via DocuSign for consent to reevaluate, Parent did not respond, and the District did not reevaluate E.W.[3] *Id.* ¶ 15.

E.W.'s annual IEP meeting occurred on February 3, 2022, with Parent and Parent's attorney attending. *See id.* ¶ 16; Ex. S-2 at 1–2, 11–12, 32–33. The IEP "identified academic, speech, and motor needs and noted behavioral concerns, including a PBSP." *Id.* "The IEP offered supplemental Life Skills Support, including direct instruction for English and Language Arts ("ELA") (50 minutes daily) and Math (20 minutes daily), plus related services: speech (60 minutes per cycle), OT (30 minutes per cycle), and PT (30 minutes per cycle). The Student spent approximately 77% of the day in general education." F.F. ¶ 17; Ex. S-2 at 39–40. Following the 2022 IEP, "[Parent] requested an [independent evaluation] IEE at public expense, which the

---

[3]    Parent alleges that she did not respond because she had concussions. *See* Pl. Mot. 41; *see also* Pl. Resp. to Def. SUMF ¶ 14. Parent responds in her brief that she could not use DocuSign and provides a District policy which permits the District to conduct testing after three requests without consent. *See id.*; *see also* Exs. S-1, S-3, S-13.

District approved," and "[Parent] selected Dr. Stephen Kachmar[4] as the evaluator." F.F. ¶ 18; *see also* N.T. 293–94.[5]

### 4. 2022-23 School Year (Fourth Grade)

The District sought Parent's consent for a "biennial reevaluation" in fall 2022. F.F. ¶ 19. Parent again did not consent. *See id.* ¶ 20. The District reevaluated E.W. in October 2022 by reviewing her records. *See id.* ¶ 21. The District held an annual IEP meeting following the record review. *See id.* ¶ 22. E.W.'s Fall 2022 IEP "identified continued needs in literacy, math, OT, PT, speech, and behavior[,] and included a PBSP." *Id.*; *see also* Ex. S-5 at 9–10, 29–30. The Fall 2022 IEP provided that E.W. would spend 77% of her school day in general education but would receive direct special instruction for ELA and Math, and life skills, speech therapy, occupational therapy, and physical therapy. *See* F.F. ¶ 23; Ex. S-5 at 34–36. "Dr. Kachmar conducted assessments and observations for the IEE between October 12, 2022, and January 10, 2023." F.F. ¶ 24.

### 5. 2023-24 School Year (Fifth Grade)

E.W.'s IEP team met on November 13, 2023, "to review progress and recommended a new English language arts (ELA) curriculum and Math intervention due to slow, uneven gains in reading and letter identification." F.F. ¶ 25; Ex. S-8 at 5–6. The November 2023 IEP noted that E.W. needed "a more receptive approach pair with verbal in the area of literacy," to focus on "phonemic awareness, alphabetic understanding, vocabulary, comprehension, accuracy, and

---

[4]    Dr. Kachmar evaluated E.W. on December 1, 2022, and January 10, 2023. *See* Ex. S-14 at 1. Dr. Kachmar observed E.W. on October 12, 2022, and January 10, 2023. *See id.* In the 2022-23 and 2023-24 school years, the District repeatedly contacted Dr. Kachmar throughout 2023 seeking the report. *See* Ex. P-2. Dr. Kachmar told both Parent and the District on November 13, 2023, that the file had become corrupted and that he had to retype the report. *See id.* at 20.

[5]    The testimony provided at the due process hearing held from October 25, 2024, through January 24, 2025, shall be denoted at "N.T."

fluency with connected text." Ex. S-8 at 5. That school year, E.W. "received whole-group instruction in general education with a modified curriculum, supplemental aids, and paraprofessional support." *Id.* ¶ 26; *see also* Ex. S-8 at 6, 30; N.T. 75–76, 79, 157–58, 171–75.

### 6.   2024 Proposed IEP (Middle School Transition)

E.W.'s IEP team met on April 29, 2024, to plan for middle school and to collect data on E.W.'s life and social skills. *See* F.F. ¶ 27. The IEP team also met on May 28, 2024, to review data on E.W.'s functional skills, "which indicated a need for daily living skills instruction." *Id.* ¶ 28. During May 2024, "[d]ue to the delay in receiving the IEE report, the District collected data on the Student's functional daily living skills using a PaTTAN checklist to assess her adaptive skills," which "indicated a need for explicit instruction in daily living skills," like arriving at school, brushing her hair, washing her hands, and departing school. *Id.* ¶ 36; *see also* Ex. S-10 at 6, 41, 43; N.T. 267–268, 299–300.

E.W.'s May 2024 proposed IEP provided she "would receive special education for full ELA and Math blocks instead of partial participation in regular education," as well as "adapted specials, like art and music." F.F. ¶ 29.[6] Such "[c]hanges in participation in regular education [were] aimed to reduce lost instructional time from transitions and improve the overall fidelity of intervention and specially designed instruction." F.F. ¶ 30. The District recommended that E.W. attend Wilson West Middle School, which was not her home middle school, because it offered life skills support. *See id.* ¶ 31. The 2024 "IEP proposed reducing the Student's general education participation from 77% to 31%, citing the need for increased instructional time in a structured

---

[6]    Adapted specials are classes like art, music, and physical education, where students in the special education class have general education peers/buddies supporting the special education students. *See* Ex. S-10 at 7.

setting for ELA and Math." *Id.* ¶ 38.[7] "The District explained that the transition to middle school required longer instructional blocks, reducing transitions to increase learning time and ensuring the implementation of intervention programs with fidelity." *Id.* ¶ 39; *see also* N.T. 250, 254.

In creating the IEP, the District considered many supplementary aids and services, including "sensory tools," "use of paraprofessional support," "hands-on instruction," and "use of a high probability request sentence," in determining E.W.'s sixth grade placement. Ex. S-10 at 46–47. The May 2024 IEP identified that the general education class could provide access to social skills but also identified that the special education classroom would provide E.W. with individualized instruction with reinforcement. *See id.* at 46.

Additionally, the May 2024 IEP noted that E.W. interacted little with other students in her fifth grade class. *See id.* at 7. When her classmates tried to speak with her, she put her head down and said, "no thank you." *Id.* The IEP also noted that E.W. preferred to eat lunch "in a place where she has ample room to herself and often does not interact with peers." *Id.* The IEP identified that E.W. demonstrated "inconsistent peer interactions" in the life skills support classroom. *Id.* Her 2024 IEP noted that she could tell others what to do at times, but other times played with classmates and "respond kindly and appropriately." *Id.* Likewise, the November 2024 IEP provided she "struggles sometimes with peer interactions," and "has been observed to invade other's personal space while sitting at a table in the cafeteria." Ex. S-15 at 10.

The 2024 IEPs provided E.W. with goals for life skills and daily routines, including washing her hands, brushing her hair, and getting out of the car. *See* Ex. S-10 at 4–6; Ex. S-15 at 7–8.

---

[7]    Parent "opposed the proposed change" and maintained E.W. "should remain at her neighborhood school with supplemental aids and support in a general education placement." F.F. ¶ 41.

### 7.  2024-25 School Year (Sixth Grade)

The District received Dr. Kachmar's report on September 18, 2024. *See* F.F. ¶ 33, *see also* Ex. S-14. "Dr. Kachmar's evaluation confirmed [E.W.'s] classification as a student with an Intellectual Disability and Speech-Language Impairment." *Id.* ¶ 45. Dr. Kachmar noted that "[s]tandardized testing revealed that [E.W.] scored below 40 in basic reading skills, letter-word identification, written language, and spelling, consistent with an Intellectual Disability." F.F. ¶ 46; *see also* S-14 at 10. "The Vineland-3 adaptive behavior assessment indicated deficits in communication, functional academics, self-direction, social skills, and independent living skills, supporting the need for structured instruction." F.F. ¶ 47; Ex. S-14 at 11. In her standardized testing, E.W. scored below the 0.1 percentile for both reading and math. *See* Ex. S-14 at 16–17. Dr. Kachmar recommended that E.W. "continue in the Life Skills Support classroom for core instruction, emphasizing the need for individualized instruction, structured reinforcement strategies, and explicit adaptive skills training." F.F. ¶ 48; Ex. S-14 at 33–35. After receiving Dr. Kachmar's report, the District "proposed another reevaluation, including cognitive, academic, and behavioral assessments." F.F. ¶ 43. Parent did not consent to the reevaluation. *See id.* ¶ 34.

In November 2024, "the District revised the proposed IEP to increase general education participation from 31% to 42%, including instruction in regular education Social Studies," and "proposed reducing functional skills instruction to three days per six-day cycle instead of daily." *Id.* ¶ 50; Ex. S-15 at 39–40, Ex. S-23. The November 2024 IEP provided E.W. with numerous speech and language therapy modifications. *See* Ex. S-15 at 35–38. "The District maintained its position that a structured Life Skills program was the most appropriate placement." F.F. ¶ 53; Ex. S-15 at 53. "Parent opposed the reduction in general education time and filed a due process

complaint seeking [E.W.'s] return to prior inclusion levels." F.F. ¶ 51; *see also* Due Process Compl., ECF No. 16-13.

### B. Due Process Hearing

Dissatisfied with the May 2024 IEP, Parent filed a due process complaint with the Office of Dispute Resolution on June 13, 2024. *See* Due Process Compl. She brought four claims: (A) IDEA, (B) Section 504 of the Rehabilitation Act, (C) Americans with Disabilities Act, and (D) 22 Pennsylvania Code Chapter 14. *See id.*

At a due process hearing before a Pennsylvania Special Education Hearing Officer, the District's witnesses included numerous teachers and support staff to discuss all aspects of the IEPs. For example, Ms. Victoria Whiteley, E.W.'s special education teacher, testified that following the implementation of the Early Literacy Skill Builders ("ELSB") curriculum and Early Numeracy Skill Builders ("ENSB") curriculum in fall 2023, E.W. made progress on her goals. N.T. 112–114. Following the change in curriculum, E.W. made progress in her ELA and Math curriculum, *see* N.T. 94, and eliminated three of her five target behaviors. *See* N.T. 831.

Additionally, E.W.'s teachers and support staff testified that that she required frequent breaks because of her limited attention span. *See* N.T. 930–31. Mr. Paul McCracken, E.W.'s sixth grade science teacher, testified that E.W. could only focus for twenty minutes at a time and only spent 50% of her attention on a task. *See* N.T. 541–42. E.W.'s special education teacher, Ms. Chelsea Snyder Herbine, also testified that E.W. struggled to focus for extended periods. *See* N.T. 478. Ms. Herbine testified that she would use the additional time that E.W. was in the life skills support classroom to break up E.W.'s lessons into manageable "chunks." N.T. 479, 486. Dr. Stephen Cogdill, the District's supervisor of special education, testified that the life skills class would "reduce[] the number of students within the classroom," and "allow[] for the instruction to

be tailored to her specific needs," and "allow[] for increased implementation of behavioral strategies." N.T. 249–52.

E.W.'s teachers also testified about how they included E.W. in their classes. Ms. Karie Braca, E.W.'s fifth grade teacher, also testified that she modified her curriculum for E.W. *See* N.T. 171–76. For ELA, Ms. Braca testified that she provided E.W. "a reading-appropriate level text" which was "similar in content" to what the rest of the fifth grade class studied at the time. *See id.* 174–75. As part of her ELA work, E.W. worked on identifying letters and sounds. *See* N.T. 176–78. Ms. Braca also spent twenty to twenty-five minutes of the ELA period working directly with E.W. foundational literacy skills. *See* N.T. 191–92. Ms. Braca also modified the math and social studies curriculum for E.W. *See* N.T. 199–203. She testified that she sometimes had to give the other students something to do and work with E.W. *See* N.T. 201–03. However, Ms. Braca also testified that E.W. frequently disrupted the class and did not pay attention. *See* N.T. 195; *see also* N.T. 463–64 (Ms. Herbine's testimony that E.W. frequently engaged in disruptive behaviors); Ex. P-2 (presenting E.W.'s behavioral chart in fifth grade, where she occasionally hit other students, broke the electric pencil sharpener, and threw things). Likewise, Mr. McCracken testified that he provided E.W. with a worksheet related to the class topics, checked in with her throughout the class, and let her participate in laboratory experiments. *See* N.T. 510–11, 519–20.

With regard to E.W.'s revised 2024 IEP, Ms. Susan Ummarino, a special education professional at West, testified that the IEP team specifically revised the 2024 IEP to include E.W. in the general education social studies class once E.W. had settled into middle school. *See* N.T. 984–85. Ms. Ummarino noted that E.W. struggled with transitions into the first period of the day,

but once E.W. made progress, the District sought to include her in the general education social studies class. *See* N.T. 986.

Parent testified at the hearing, as did her expert, Dr. Jenna Rufo. Parent testified that her daughter could remain in the general education classroom with co-teaching. *See* N.T. 637–38. Parent also denied that E.W. required life skills instruction. *See* N.T. 641, 655. Likewise, Dr. Rufo disagreed with the reduction of time in the general classroom, from 77% to 31% (and revised to 42%). *See* F.F. ¶ 69; *see also* N.T. 718. Dr. Rufo also recommended different literacy instruction programs which focused on systematic phonics instead of a sight-word approach. *See* F.F. ¶¶ 75–76. Dr. Rufo recommended that E.W. remain in the general education class for at least 77% of the day, with supplementary aids and services. *See* F.F. ¶ 80; N.T. 756–64. Dr. Rufo testified that the E.W.'s "instruction was disconnected from classroom learning, such as when she was working on unrelated skills instead of participating in a grammar lesson." F.F. ¶ 68; N.T. 802.

The Hearing Officer rendered his decision on March 7, 2025. *See* H.O.D., ECF No. 16-3. The Hearing Officer found that the District's IEPs provided E.W. with a free, appropriate public education ("FAPE") and satisfied the least restrictive environment ("LRE") mandate under the IDEA. *See id.* at 16–23. The Hearing Officer also found that the IEPs did not violate Section 504's FAPE provision. *See id.* at 24–27. The Hearing Officer dismissed the ADA and Section 504 discrimination claims for lack of jurisdiction. *See id.* at 23–24, 27–28

### 1. Credibility Determinations

The Hearing Officer afforded greater weight to the District's witnesses' testimony. *See* H.O.D. 15–16. First, the Hearing Officer found that Parent's testimony "was largely unpersuasive." *Id.* at 14. The Hearing Officer acknowledged that "[Parent's] singular focus on

10
021726

maintaining [E.W.] in a regular education setting caused her to overlook the IEE evaluator's results and the expert Dr. Rufo's somewhat balanced placement recommendations." *Id.* The Hearing Officer stated that instead of "engaging with the team to understand the full scope of the evaluations, [Parent] selectively relied on data that supported her position while dismissing findings that indicated the need for services outside of regular education, undermining the credibility of her stance." *Id.* at 14–15.

Second, the Hearing Officer noted that "the District's witnesses demonstrated a clear and comprehensive understanding of the Student's strengths, weaknesses, needs, and overall circumstances." *Id.* at 15. The Hearing Officer reasoned that the District's witnesses' "testimony was well-organized and data-driven, and it provided insight into the basis for their conclusions." *Id.* The Hearing Officer found that "the teachers exhibited an openness to understanding the data, including [Dr. Kachmar's] testing, and incorporated that information into their assessments of E.W.'s needs and circumstances." *Id.*

Third, the Hearing Officer found that Dr. Rufo's testimony was "informative, organized, and somewhat persuasive[.]" *Id.* at 15. The Hearing Officer found that Dr. Rufo "did not criticize [Dr. Kachmar's] test selection, scoring, or overall recommendations." *Id.* Yet, the Hearing Officer noted that Dr. Rufo's "partial acceptance of [Dr. Kachmar's] findings created an impression of credibility, her recommendations were often heavily influenced by her personal teaching preferences and a philosophical commitment to certain best practices." *Id.* As a result, the Hearing Officer determined that such a commitment "created an impression that the objective test data was unevenly weighed." *Id.* The Hearing Officer noted that some of Dr. Rufo's comments "blurred the lines between best practices and her educational teaching philosophy[,] and included intertwined conclusions of law, which, when weighed, undermined the neutrality of

her analysis." *Id.* The Hearing Officer referred to Dr. Rufo's testimony as "Monday morning quarterbacking," as opposed to "a fair assessment of the District's decision-making at the time." *Id.*[8]

### 2. Hearing Officer Conclusions of Law

The Hearing Officer concluded that the District's IEPs provided E.W. with a FAPE. H.O.D. 16. The Hearing Officer determined that the procedural challenges levied by Parent "lack[ed] merit." *Id.* at 17. Rather, the Hearing Officer concluded that the IEPs were procedurally compliant with the IDEA and "included measurable goals, progress monitoring, specially designed instruction (SDI), and multiple accommodations tailored to the Student's needs." *Id.* at 17. Furthermore, the Hearing Officer determined that "[t]he IEPs were developed collaboratively, with active input from the Parent, the Parent's attorney, and the Parent selected experts." *Id.* "[Parent's] refusal to consent to the reevaluation in–Nov. 2021, Sept. 2022, and Sept. 2024–prevented the team from obtaining updated accurate time functional assessment data." *Id.* The Hearing Officer also concluded that there was no procedural violation based on the delay in receiving Dr. Kachmar's report. *See id.* The Hearing Officer identified no evidence that the District intended to delay issuing the report. *See id.* To the contrary, the Hearing Officer determined the District repeatedly contacted Dr. Kachmar about the status of the report. *See id.*

Regarding whether the IEPs were reasonably calculated to provide E.W. with a meaningful educational benefit, the Hearing Officer concluded that "the ongoing testing, progress monitoring, and assessments were otherwise legally sufficient." *Id.* The Hearing Officer

---

[8]    The Court gives "due weight" to the credibility determinations of the Hearing Officer. A court must accept the credibility determinations of the agency's hearing officer "unless the non-testimonial, extrinsic evidence in the record would  justify a contrary conclusion." *A.F.*, 506 F. Supp. 3d at 302–03. Upon the Court's review of the record, the Court finds that the record supports the Hearing Officer's credibility determinations.

found that E.W. made "maddingly slow but steady gains, including behavioral progress, increased academic engagement, and greater participation, with and without support in school activities." *Id.* at 17–18. The Hearing Officer determined that the District's use of Edmark and ELSB for E.W.'s ELA curriculum was "research-based and appropriate." *Id.* at 18. Finally, the Hearing Officer concluded that the IEPs provided adequate behavioral support by consistently evaluating E.W.'s behavioral needs. *See id.* at 18–19.

As part of the FAPE analysis, the Hearing Officer concluded that the District had placed E.W. in the least restrictive environment ("LRE"). *See id.* at 20–21. In making his decision, the Hearing Officer considered E.W.'s "testing, progress monitoring, behavioral data, the academic data, social skills, and the adaptive behaviors checklist, along with teacher and Parent input." *Id.* at 20. The Hearing Officer reasoned that E.W.'s placement was based on "educational need, not convenience." *Id.* at 21. The Hearing Officer noted that both Dr. Rufo and Dr. Kachmar testified that E.W. required specialized instruction in ELA and Math. *See id.* E.W.'s teachers also testified that she "struggled to participate in whole-group settings" and required "near-constant" one-on-one attention. *Id.* Regarding E.W.'s educational benefit from the general education classroom, the Hearing Officer reasoned "teacher testimony and observational data confirm that [E.W.'s] presence in a large-group setting required disproportionate instructional resources, impacting both [E.W.'s] learning and that of peers," which justified placement in special education. *Id.* at 22. He noted that "[p]lacement in general education is not required if the necessary curriculum modifications fundamentally alter the general education program beyond recognition." *Id.* The Hearing Officer concluded that the District's decision aligned with precedent, given "students who do not meaningfully interact with peers" in general education or "derive only superficial benefits should be placed in more appropriate settings." *Id.* The Hearing Officer determined

"[g]iven the overall circumstances, including [E.W.'s] learning style, rate of learning, slow educational progress in general education, the need for specialized instruction, the disruptive impact on the learning environment, and the extensive modifications required, maintaining 77% of the school day in regular education is inappropriate." *Id.* at 23.

With regard to whether the District offered E.W. a FAPE under Section 504, the Hearing Officer performed a "standalone Section 504 Analysis." H.O.D. 24. The Hearing Officer concluded that "the District fully complied with its substantive obligations by designing and implementing an IEP that provided appropriate services, supports, and accommodations tailored to [E.W.'s] specific needs." *Id.* at 26. The Hearing Officer held that the District provided E.W. with "reasonable accommodations [including instruction, a PBSP, and supplemental aids] that granted [her] access to the general education curriculum on equal footing with nondisabled peers." *Id.* He likewise concluded that E.W. "was placed alongside nondisabled peers to the maximum extent appropriate, in compliance with 34 C.F.R. § 104.34." *Id.* at 27. The Hearing Officer determined that the District fulfilled both Section 504's FAPE and LRE requirements. *See id.* Finally, the Hearing Officer concluded "[t]he District conducted a series of comprehensive evaluations to determine the Student's eligibility and individual needs in accordance with 34 C.F.R. § 104.35." *Id.*

The Hearing Officer denied Parent's IDEA and Section 504 FAPE claims and dismissed Parent's Section 504 and ADA claims without prejudice. *See id.* at 28.

### C.  Procedural History

Parent filed a Complaint in the above-captioned action on June 5, 2025. *See* Compl., ECF No. 1. The Complaint asserts the following counts:

1. Violation of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.,* and 34 C.F.R. Part 300;

2. Intentional and purposeful violation of E.W.'s rights under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 and 34 C.F.R. § 104.4;

3. Violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131, *et seq.,* and 28 C.F.R. § 35.130; and

4. Violation of Pennsylvania Special Education Regulations, 22 Pa. Code § 14.145. [9]

Compl. ¶¶ 197–200, ECF No. 1.

Parent argues that the Hearing Officer committed many errors that necessitate overturning his decision. First, Parent argues that the Hearing Officer erred by concluding "that the District's compliance with formal, procedural requirements of IDEA established that its proposed placement for E.W. was appropriate." Pl. Mot. at 38 (citing H.O.D. 20). Parent also alleges that the District could have reevaluated E.W. without parental consent. *See id.* at 41. Parent contends that the District predetermined E.W.'s sixth grade placement solely based on the middle school schedule. *See* Pl. Mot. 54–55.

Second, Parent makes numerous arguments that the District did not provide E.W. with a free, appropriate public education. *See* Pl. Mot. 36–39. Parent maintains that the Hearing Officer ignored E.W.'s "shocking lack of progress" in school. *Id.* at 39. Parent cites numerous areas where she alleges E.W. did not progress. *See* Pl. SUMF ¶¶ 30, 56. Parent disagrees with the District's use of the ELSB curriculum. *See id.* ¶ 36. Parent also argues that the Hearing Officer

---

[9]    Chapter 14 of the Pennsylvania Code incorporates and implements the IDEA. *See Elena M. by & through Hans M. v. Sch. Dist. of Phila.*, No. 22-4767, 2025 WL 968310, at *4 n.3 (E.D. Pa. Mar. 31, 2025) (citation omitted). The Court thus interprets Parent's Pennsylvania claim alongside her IDEA claim.

erred by "mischaracterizing [] Parent's claim that E.W. has been denied appropriate instruction in literacy," because E.W. could not read sight words. Pl. Mot. 39.

Third, Parent makes many arguments regarding whether the District provided E.W. with a FAPE in the least restrictive environment. *See* Pl. Mot. 36–39. Parent argues that the Hearing Officer failed to apply the Third Circuit's test from *Oberti ex rel. Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist. See id.* at 36 (citing 995 F.2d 1204, 1213 (3d Cir. 1993)).[10] Parent contends "[t]he Hearing Officer ignored the evidence that the District failed to consider, at the IEP meetings in May and September, 2024, the full range of supplementary aids and services that could enable E.W. to be educated satisfactorily in general education classes." *Id.* Parent also maintains "[t]he Hearing Officer failed to compare the substantive educational, social, communication[,] and behavioral benefit to E.W. of placement in general education classes and special education classes respectively, as is required by *Oberti*." *Id.* Finally, Parent claims the Hearing Officer ignored her argument that "the District has denied her the opportunity to be involved and progress in the general education curriculum." *Id.* at 39.

Fourth, Parent asserts that the Hearing Officer erred in treating E.W.'s Section 504 FAPE claim "as though it were 'subsumed'" in the IDEA claim. *Id.* at 36–37. Parent argues that the Hearing Officer had to analyze her Section 504 claims "separately and independently of her IDEA claims." *Id.* at 37.

Fifth, Parent alleges that the District discriminated against E.W. in three ways. First, Parent maintains that the District discriminated against E.W. by placing her in separate classes from her peers. *See* Pl. Mot. 62. Second, Parent argues that the District failed to satisfy the

---

10    The *Oberti* test relates to whether a school district considered whether a student can be educated in the general education curriculum with supplementary aids and services. *See id.*

16
021726

ADA's effective communication requirement, maintaining that there was no evidence in the record that the District ever "proposed" or "contemplated[] evaluating [E.W.] for [augmentive communication] services[.]" *Id.* at 58. Third, Parent asserts that there is no evidence that the District ever analyzed "the reasons why speech therapy has not succeeded in making her speech more understandable."[11] *Id.*

The District filed its Answer on August 11, 2025. *See* Answer, ECF No. 6. The District filed its Motion for Summary Judgment on December 1, 2025. *See* Def. Mot., ECF No. 11. Parent filed her Motion for Judgment on the Administrative Record on December 2, 2025. *See* Pl. Mot., ECF No. 14. The Pennsylvania Office of Dispute Resolution sent the administrative record to the Court on December 4, 2025. *See* A.R., ECF No. 16. On December 15, 2025, Parent filed her Response in Opposition to the Defendant's Motion. *See* Pl. Resp. Def. Mot., ECF No. 18. The District filed its Response in Opposition to the Parent's Motion on December 16, 2025. *See* Def. Resp. Pl. Mot., ECF No. 19. Parent filed a Reply to the Defendant's Motion on December 23, 2025. *See* Pl. Reply. Def. Mot., ECF No. 20. The parties also submitted statements of fact. *See* Def. SUMF, ECF No. 11-1; Pl. SUMF, ECF No. 14-1; Pl. Resp. to Def. SUMF, ECF No. 18-2; Def. Resp. to Pl. SUMF, ECF No. 19-2.

## III.    LEGAL STANDARDS

### A.  Summary Judgment – Review of Applicable Law

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is "material" if proof of its existence or nonexistence might affect the

---

[11]    Notably, Parent initially filed her Complaint based on E.W.'s discrimination by placement (28 C.F.R. § 35.130 *et seq.*) and only now changes her argument to include the effective communication regulation.

outcome of the case under applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 257.

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The court must consider the evidence in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### B.  Review of Hearing Officer Decision

A party aggrieved by a hearing officer's findings and decision may bring a civil action in a federal district court within 90 days from the date of the hearing officer's decision. *See* 20 U.S.C. §§ 1415(i)(2)(A)–(B). The reviewing court shall (i) "receive the records of the administrative proceeding"; (ii) "hear additional evidence at the request of a party"; and (iii) "grant such relief as the court determines is appropriate" based "on the preponderance of the evidence." 20 U.S.C. §§ 1415(i)(2)(C)(i)–(iii).

Courts reviewing an appeal from a state agency's decision under the IDEA apply a "modified *de novo* standard of review." *Montgomery Cnty. Intermediate Unit No. 23 v. A.F. ex rel. D.F.*, 506 F. Supp. 3d 293, 302 (E.D. Pa. 2020) (quoting *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012)). Accordingly, courts "must give 'due weight' to the findings of the administrating proceeding (also known as a 'due process hearing' in IDEA parlance)." *A.F.*, 506 F. Supp. 3d at 302 (quoting *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010)).  In practice, the "due weight" standard means that "factual findings from the administrative proceedings are to be considered *prima facie* correct." *A.F.*, 506 F. Supp. 3d at 302–03 (quoting *D.S.*, 602 F.3d at 564). A court must accept the credibility determinations of the agency's hearing officer "unless the non-testimonial, extrinsic evidence in the record would  justify a contrary conclusion." *Id.* Should a court find that a contrary conclusion is warranted, "it is obliged to explain why." *Id.* The district court is therefore to give "requisite deference" when the hearing officer affords more or less weight to the testimony of various experts based upon the nature of their expertise or the amount of time spent with the child. *Id. See also T.M. ex rel. T.M. v. Quakertown Cmty. Sch. Dist.*, No. 16-3915, 2017 WL 1406581, at *13 (E.D. Pa. Apr. 19, 2017).

"With regard to conclusions of law, the review is plenary." *Id.* (quoting *Rose Tree Media Sch. Dist. v. M.J. ex rel. M.J.*, No. 18-cv-1063, 2019 WL 1062487, at *3 (E.D. Pa. Mar. 6, 2019)). "[T]he party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged."  *Id.* (quoting *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012)).

### C.  IDEA and Section 504 Duties

The IDEA was drafted to "ensure that all children with disabilities have available to them a free appropriate public education [FAPE] that emphasizes special education and related

services deigned to meet their unique needs . . . ." 20 U.S.C. § 1400(d)(1)(A). "Section 504 of the Rehabilitation Act is parallel to the IDEA in its protection of disabled students: it protects the rights of disabled children by prohibiting discrimination against students on the basis of disability, and it has child find, evaluation, and FAPE requirements, like the IDEA." *P.P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009). "School districts have a continuing obligation under the IDEA and § 504 to identify and evaluate all students who are reasonably suspected of having a disability under the statutes." *Id.* at 738.

"Child Find extends to children 'who are suspected of [having] . . . a disability . . . and in need of special education, even though they are advancing from grade to grade.'" *D.K.*, 696 F.3d at 249 (quoting 34 C.F.R. § 300.111(c)(1)). However, "Child Find does not demand that schools conduct a formal evaluation of every struggling student" and a "school's failure to diagnose a disability at the earliest possible moment is not per se actionable." *Id.* "Neither the statutes nor regulations establish a deadline by which time children who are suspected of having a qualifying disability must be identified and evaluated, but [the Third Circuit] infer[s] a requirement that this be done within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability." *W.B. v. Matula*, 67 F.3d 484, 501 (3d Cir. 1995). There is "no bright-line rule as to what constitutes a reasonable time." *Id.*

Once an evaluation is requested, an initial evaluation must be conducted "within 60 days of receiving parental consent for the evaluation." 20 U.S.C. § 1414(a)(1)(C)(i)(II); *see also* 22 Pa. Code § 14.123(b); 34 C.F.R. § 300.301(c)(1)(i). The sixty days excludes time "from the day after the last day of the spring school term up to and including the day before the first day of the subsequent fall school term." 22 Pa. Code § 14.123(b). A reevaluation "[m]ay occur not more than once a year, unless the parent and the public agency agree otherwise; and [m]ust occur at

20
021726

least once every 3 years, unless the parent and the public agency agree that a reevaluation is unnecessary." 34 C.F.R. § 300.303(a).[12] A school's failure to abide by these timelines may amount to a "procedural violation." *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 68 (3d Cir. 2010). A "procedural violation alone cannot support a compensatory education award." *P.P.*, 585 F.3d at 738. "A procedural violation is actionable under the IDEA only if it results in a loss of educational opportunity for the student, seriously deprives parents of their participation rights, or causes a deprivation of educational benefits." *D.S.*, 602 F.3d at 565 (citing *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 525-26 (2007)). "Thus, even where a district engages in 'egregious' delay prior to evaluating a child, if that child has not been denied an appropriate education during this period, the violation has been deemed purely procedural and a child is not entitled to compensatory education." *G.D. v. Wissahickon Sch. Dist.*, 832 F. Supp. 2d 455, 468 (E.D. Pa. 2011).

To provide a FAPE, a school district must offer the student an IEP that is "reasonably calculated to enable a child to make progress in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017). The Third Circuit has interpreted this standard to require that a district provide the student with a "meaningful educational benefit[] in light of the student's intellectual potential." *D.S.*, 602 F.3d at 557 (quoting *Chambers v. Phila. Bd. of Educ.*, 587 F.3d 176, 182 (3d Cir. 2009)). The IDEA contemplates that the act of developing the IEP "will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians." *Endrew F.*, 580 U.S. at 399 (citing *Bd. of Educ. of Hendrick Hudson Central Sch. Dist., Westchester Cnty. v. Rowley*, 458

---

[12]    "Students with disabilities who are identified as mentally retarded shall be reevaluated at least once every 2 years." 22 Pa. Code § 14.124(c).

U.S. 176, 208-09 (1982)). The educational program resulting from an IEP must be "appropriately ambitious in light of [the child's] circumstances." *Endrew F.*, 580 U.S. at 402. However, the IDEA does not require that a state "maximize the potential of children with disabilities." *Rowley,* 458 U.S. at 189–90; *see also Alexander G. through Stephen G. v. Downingtown Area Sch. Dist.*, No. 20-131, 2021 WL 1614400, at \*3 (E.D. Pa. Apr. 26, 2021). While an "IEP must aim to enable the child to make progress," *Endrew*, 580 U.S. at 399, the IDEA does not guarantee any particular level of education. *See Rowley*, 458 U.S. at 192. Whether an IEP is appropriate is a question of fact. *See S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 271 (3d Cir. 2003).

Additionally, the IDEA requires that students be educated in the "least restrictive environment" ("LRE"):

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A); *see also Oberti*, 995 F.2d at 1213.

Courts in the Third Circuit follow the two-part test from *Oberti* to determine whether a student is educated in the least restrictive environment. First, "the court must determine 'whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily.'" *Id.* at 1215 (citing *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989)). In evaluating the first part of the *Oberti* test, the court must consider the following three factors:

> (1) whether the school district has made reasonable efforts to educate the student in a regular classroom;

(2) the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in the special education class; and
(3) the possible negative effects of the inclusion of the child on the education of the other students in the class.

*Oberti*, 995 F.2d at 1217–18.

"Second, if the court finds that placement outside if a regular classroom is necessary for the child to benefit educationally, then the court must decide 'whether the school has mainstreamed the child to the maximum extent appropriate,' i.e., whether the school has made efforts to include the child in school programs with nondisabled children whenever possible." *Id.* at 1215 (citing *Daniel R.R.*, 874 F.2d at 1048).

### D.  Claim for Denial of FAPE under IDEA – Review of Applicable Law

The IDEA allows parents who believe their child is being denied a FAPE to file a complaint. *See* 20 U.S.C. § 1415(b)(6)(A). After administratively exhausting their complaint, parents then "have the right to bring a civil action with respect to the complaint . . . in a district court of the United States." 20 U.S.C. § 1415(i)(2)(A). Determining a school district's liability for a violation of the IDEA is a two-part inquiry: "(1) Has the school district complied with the procedures set forth in IDEA?; and (2) [h]as the school district fulfilled its obligation to provide the student with a FAPE?" *A.F.*, 506 F. Supp. 3d at 304 (quoting *C.H.*, 606 F.3d at 66). Put another way, the second part of the inquiry asks whether the student's IEP was "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 399. "Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." *Id.* at 399. The courts shall not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206.

### E.  Section 504 Claim

Section 504 of the Rehabilitation Act provides that "'[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination' under any program that receives federal funds." *M.R.*, 680 F.3d at 280 (quoting 29 U.S.C. § 794(a)). Persons "alleging violations of Section 504 have a private right of action under federal law." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 206 n.2 (3d Cir. 2009). To establish a violation of Section 504, a parent must show:

> (1) the child was disabled;
> (2) the child was "'otherwise qualified' to participate in school activities;"
> (3) the school district received "federal financial assistance;" and
> (4) the child was "excluded from participation in, denied the benefits of, or subject to discrimination" by the district.

*M.R.*, 680 F.3d at 280 (citing *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 253 (3d Cir. 1999)). "[A] school district must reasonably accommodate the needs of the handicapped child so as to ensure meaningful participation in educational activities and meaningful access to educational benefits." *M.R.*, 680 F.3d at 280 (citing *J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 70 (3d Cir. 2000)). A school district is "not required to grant the specific accommodations requested by Parents or otherwise make substantial modifications to the programs that were used for all other students." *M.R.*, 680 F.3d at 282. "The fact that it is more convenient, either administratively or fiscally, to provide services in a segregated manner, does not constitute a valid justification for separate or different services." *Id.* at 281 (quoting *Helen L. v. DiDario*, 46 F.3d 325, 338 (3d Cir. 1995)).

To provide an appropriate education under Section 504, a recipient must provide regular or special education and related aids and services that

(i) are designed to meet individual educational needs of handicapped persons
as adequately as the needs of nonhandicapped persons are met and
(ii) are based upon adherence to procedures that satisfy the requirements of
§§ 104.34, 104.35, and 104.36.

34 C.F.R. § 104.33(b)(1).

The Third Circuit has held that "there are few differences, if any, between IDEA's affirmative duty and [Section] 504's negative prohibition, and have noted that the regulations implementing [Section] 504 require that school districts 'provide a free appropriate education to each qualified handicapped person in [its] jurisdiction.'" *Ridgewood Bd. of Educ.*, 172 F.3d 238, 253 (3d Cir. 1999) (citing *Matula*, 67 F.3d at 492–93). Section 504's "'negative prohibition' is similar to the IDEA's 'affirmative duty'" such that a finding that a student received a FAPE under the IDEA "is equally dispositive" of a Section 504 claim. *D.K.*, 696 F.3d at 253 n.8.

However, courts in the Third Circuit must provide a separate Section 504 analysis, even if based upon the same facts as the IDEA claim, unless the parties do not present evidence "unique to the Section 504 claim." *See B.S.M. v. Upper Darby Sch. Dist.*, 103 F.4th 956, 964–65 (3d Cir. 2024) (citing *J.M. v. Summit City Bd. of Educ.*, 39 F.4th 126, 146–47 (3d Cir. 2022)) (cleaned up). Section 504 claims are subject to *de novo* review. *Le Pape v. Lower Merion Sch. Dist.*, 103 F.4th 966, 983 (3d Cir. 2024); *B.S.M.*, 103 F.4th at 965 n.6.

### F. Americans with Disabilities Act ("ADA")

To state a claim under the ADA,[13] the plaintiff must prove that (1) she "has a disability, or was regarded as having a disability," (2) she "was 'otherwise qualified' to participate in school activities," and (3) she was "denied the benefits of the program or was otherwise subject to discrimination because of [her] disability." *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 269

---

[13]    The same standards govern both ADA and Section 504 discrimination claims. *Chambers,* 587 F.3d at 189.

(3d Cir. 2014) (quoting *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009)). ADA claims are subject to *de novo* review. *See Le Pape*, 103 F.4th at 976 n.3, 983. "The ADA 'extends the nondiscrimination rule of [Section 504] to services provided by any 'public entity' (without regard to whether the entity is a recipient of federal funds).'"*James S. ex rel. Thelma S. v. Sch. Dist. of Phila.*, 559 F. Supp. 2d 600, 622 (E.D. Pa. 2008) (citing *Jeremy H. v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 279 (3d Cir. 1996)).

The ADA has an effective communications requirement, which provides "[a] public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1). Accordingly, "[a] public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, [], an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1). "[T]he effectiveness of auxiliary aids and/or services is a question of fact[.]" *Chisolm v. McManimon*, 275 F.3d 315, 327 (3d Cir. 2001). Furthermore,

> [t]he type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

28 C.F.R. § 35.160(b)(2).

### G.  Additional Evidence

In reviewing a motion for judgment on the administrative record under the IDEA, the district "court (i) shall receive the records of the administrative proceedings; (ii) shall hear

additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as it determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). "[C]ourts have consistently held that district courts have discretion to decide whether to admit additional evidence after evaluating it for admissibility." *J.D. v. Pa. Virtual Charter Sch.*, No. 19-0129, 2020 WL 1233559, at *1 (E.D. Pa. Mar. 12, 2020); *see, e.g.*, *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 762 (3d Cir. 1995). Additional "evidence may be considered only with respect to the *reasonableness* of the district's decision at the time it was made." *Susan N.*, 70 F.3d at 762.

Courts in this District typically apply a "non-exhaustive list of factors" in deciding whether to allow additional evidence beyond the administrative record. *Antoine M. v. Chester Upland Sch. Dist.*, 420 F. Supp. 2d 396, 403 (E.D. Pa. 2006); *see also Brown v. Sch. Dist. of Phila.*, No. 11–6019, 2013 WL 1561565, at * 4 (E.D. Pa. Apr. 11, 2013). The factors include: (1) "[t]he existence of a procedural bar which prevented the introduction of the proffered evidence below, such as a limitations period;" (2) "[w]hether the evidence was deliberately withheld at the administrative level for strategic reasons;" (3) the prejudicial effect on the adverse party if the evidence were admitted; and (4) "[t]he potential impact on the administration of justice," like whether the evidence presented a novel legal theory. *Antoine M.*, 420 F. Supp. 2d. at 403.

## IV. ANALYSIS

### A. IDEA

#### 1. The IEPs complied procedurally with the IDEA.

After review of the record, the Court concludes that the District complied with all procedural requirements of the IDEA. The Hearing Officer concluded that any delays in evaluating E.W. were attributable to Parent's refusal to consent to E.W.'s reevaluation. *See* H.O.D. 17. The Court agrees with the Hearing Officer. Without parental consent, the District was

27
021726

not required to reevaluate E.W. *See* 34 C.F.R. § 300.300(c)(1)(ii)–(iii). Regardless, the District continually reviewed E.W.'s school records in lieu of a reevaluation. *See* 34 C.F.R. § 300.300(d)(1)(i). The record shows that, even without a formal reevaluation, the District continually updated the IEPs to reflect her needs at the time based on the available records. *See* H.O. F.F. ¶¶ 16, 21; *see also* Ex. S-4 (presenting a reevaluation report based on the District's review of E.W.'s records). Also, the District regularly held IEP meetings for E.W. based on the available records, which Parent attended. *See id.* ¶¶ 16, 22, 25, 28, 37, 50; *see also* Exs. S-2, S-5, S-8, S-9, S-10, S-15. Parent does not present evidence that E.W. lost any educational benefits from the delayed reevaluation. Thus, the District's failure to reevaluate E.W. did not result "in a loss of educational opportunity for [E.W.], seriously deprives parents of their participation rights, or causes a deprivation of educational benefits." *D.S.*, 602 F.3d at 565.[14]

Furthermore, the Court finds that the District did not purposely delay releasing Dr. Kachmar's report. Parent points to no evidence that the District delayed releasing Dr. Kachmar's report. To the contrary, the District repeatedly contacted Dr. Kachmar throughout 2023 seeking the report. *See* Ex. P-13. In November 2023, Dr. Kachmar told both Parent and the District that

---

[14]    Parent's argument that the District predetermined E.W.'s placement likewise fails. "'Predetermination of an IEP can be grounds for finding a violation of the IDEA, in particular because predetermination can serve to exclude parents from meaningfully participating in the decision making process.'" *J.C.*, 2022 WL 17324587, at *11 (citing *D.B. ex rel. H.B. v. Gloucester Twp. Sch. Dist.*, 751 F. Supp. 2d 764, 771 (D.N.J. 2010), *aff'd sub nom. D.B. v. Gloucester Twp. Sch. Dist.*, 489 F. App'x 564 (3d Cir. 2012)).
The Court notes that Parent did not raise the predetermination argument in her due process complaint or in her Complaint before the Court. For a district court to have subject matter jurisdiction over an IDEA claim, the claimant must first exhaust administrative remedies under the statute. *See Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272–74 (3d Cir. 2014). Such remedies involve filing a due process complaint and holding a due process hearing. *See T.L. by & through Latisha G. v. Pa. Leadership Charter Sch.*, 224 F. Supp. 3d 421, 425 (E.D. Pa. 2016). Parent has not brought her predetermination claim before in any forum. As such, Parent did not exhaust her predetermination claim.

the report file had become corrupted and that he had to retype the report. *See id.* at 20. Again, Parent does not present any evidence that E.W. lost any educational benefit from the delay surrounding Dr. Kachmar's report, nor that Parent could not participate in the drafting of the IEP. Parent fails to allege that the delay in receiving Dr. Kachmar's report was a procedural violation, much less one that deprived E.W. of "educational benefits." *See D.S.*, 602 F.3d at 565.

### 2.   The IEPs offered E.W. a free, appropriate public education

The question before the Court is whether E.W.'s 2022-23, 2023-24, and 2024-25 IEPs were "reasonably calculated to enable [E.W.] to make progress appropriate in light of [her] circumstances." *Endrew F.*, 580 U.S. at 399; *see also J.M. v. Christina Sch. Dist.*, No. 23-559, 2024 WL 5135900, at *3 (D. Del. Dec. 17, 2024) (finding that the IEPs provided the student with a FAPE). The Court concludes they were. All the IEPs offered services directed toward E.W.'s "areas of weakness", such as reading, math, speech and language therapy, life skills, occupational therapy, and physical therapy. *See* Exs. S-5, S-8, S-10, and S-15; *J.M.*, 2024 WL 5135900, at *3. Upon considering the evidence, including the IEPs, E.W.'s behavioral tests, Dr. Kachmar's independent report, Parent's expert report and testimony, and testimony from District staff, and Parent herself, the Hearing Officer concluded that the IEP provided E.W. with a FAPE in all three school years. *See* H.O.D. 16–17. The Hearing Officer concluded that the IEPs accounted for E.W.'s "ability, achievements, and circumstances," in the face of "ongoing testing, progress monitoring, and assessments." *Id.* at 17. He noted that E.W. made "maddingly[15] slow but steady gains, including behavioral progress, increased academic engagement, and greater participation, with and without support in school activities" in the general education classroom. *Id.* at 17–18. The Hearing Officer noted that E.W. did not perform at grade level, but "neither the

---

[15]     The Court interprets this phrase to mean "maddeningly."

IDEA nor Section 504 require grade-level mastery." *See id.* at 18. After plenary review, the Court agrees and concludes all three IEPS provided a FAPE.

The Court's review of the 2022-23 IEP confirms that it provided E.W. with a FAPE. The 2022-23 IEP offered direct special instruction in ELA and Math classes but kept E.W. in the general education class for 77% of the school day. *See* Ex. S-5 at 35–36. The 2022-23 IEP set goals in the areas of speech and language therapy, physical therapy, number identification, rote counting, sight word identification, letter identification, and life skills. *See id.* at 4–10. The IEP set manageable goals based on E.W.'s areas of weakness, including assisting her in counting to fifteen, reading additional sight words, and improving her gross motor skills. *See id.* at 4–5. Such goals were reasonably calculated to meet E.W.'s academic, behavioral, and social needs and confer a meaningful educational benefit. Thus, the Court finds that E.W.'s 2022-23 IEP provided her with a FAPE.

The 2023-24 IEP also provided E.W. with a FAPE. In November 2023, the IEP team changed E.W.'s ELA and Math curriculum "due to slow, uneven gains in reading and letter identification." F.F. ¶ 25; *see also* Ex. S-8 at 5, N.T. 103, 112-114. As part of this IEP, E.W. "received whole-group instruction in general education with a modified curriculum, supplemental aids, and paraprofessional support." F.F. ¶ 26; *see also* Ex. S-8 at 6. The new ELA and Math curricula sought to provide E.W. with a more receptive approach to learning, as well as repetition and practice. *See* Ex. S-8 at 5–6. The record reflects that E.W. made academic progress in the new curricula.[16] *See* N.T. 94. The 2023-24 IEP also set reasonable goals for E.W.,

---

[16]    Parent disagrees with the District's use of the new ELSB curriculum; however, "neither parents nor courts have a right to compel a school district to employ a specific methodology in educating a student." *W.R. v. Union Beach Bd. of Educ.*, 414 F. App'x 499, 501 (3d Cir. 2011) (citing *Rowley*, 458 U.S. at 208).

including in rote counting, sight word identification, and speech and language therapy. *See* Ex. S-8 at 5-10. E.W. met many of her goals under the new curriculum. When E.W.'s progress in the general education classroom was slow, *see* N.T. 249–51, the District examined E.W.'s progress in her core subjects and modified the IEP to help E.W. hit her academic targets. Following the institution of the IEP, E.W. also made behavioral progress, eliminating three out of her five target behaviors. *See* N.T. 831. The District, rather than denying E.W. a meaningful educational benefit, sought to assist E.W. in improving academically and behaviorally. Therefore, E.W.'s 2023-24 IEP provided her with a FAPE.

Likewise, E.W.'s proposed May 2024 IEP, as amended in November 2024, provided her with a FAPE. In formulating the IEPs, the District, recognizing that E.W. was starting middle school, considered E.W.'s progress and testing, as well the lost instructional time from transitions between classes. *See* F.F. ¶ 29. The District increased her time in special education for the full ELA and Math blocks to adapt to the longer class times in middle school and directly implement E.W.'s ELA and Math curricula through direct instruction. *See id.* ¶ 30; *see also* N.T. 249–51. Additionally, many of E.W.'s teachers testified that she struggled to focus in class, could only pay attention for twenty minutes at a time, and required individualized attention to avoid distractions. *See* N.T. 251–52, 478, 541–42. In E.W.'s May 2024 IEP, the District provided her with more time in special education to match her attention span and her academic and behavioral needs and placed E.W. in regular education classes for 31% of the school day. *See* F.F. ¶ 38; *see also* Ex. S-10. In November 2024, the District increased her participation in general education to 42% of the school day, placed E.W. in the general education social studies class, and reduced her life skills support from six times a week to thrice a week. *See* F.F. ¶ 50; *see also* Ex. S-15. The 2024 IEPs directly reflected E.W.'s goals, which differed from those of her classmates. The IEPs

offered placement in both the general and special education classrooms to improve her performance in core subjects and life skills. The 2024 IEPs reasonably addressed E.W.'s transition to middle school and her "underlying areas of weakness," like ELA, Math, and life skills. *Ruari C. by & through Ronan C. v. Pennsbury Sch. Dist.*, No. 22-4080, 2023 WL 5339603, at *7 (E.D. Pa. Aug. 18, 2023), *aff'd*, No. 23-2702, 2024 WL 3633700 (3d Cir. Aug. 2, 2024) (finding that the school district provided a FAPE because it provided the student with direct instruction in social skills). Thus, the 2024 IEPs were reasonably calculated to afford E.W. a meaningful educational benefit. Parent's disagreement with E.W.'s middle school placement does not make it unreasonable.

Furthermore, to the extent that E.W. made "maddingly slow" gains, her progress alone does not mean that the District did not provide her with a FAPE. A student's after-the-fact progress is not determinative as to whether an IEP was reasonably calculated to confer a meaningful educational benefit. *See J.C. v. Upper Darby Sch. Dist.*, No. 20-5030, 2022 WL 17324587, at *10 (E.D. Pa. Nov. 29, 2022) (citing *D.S.*, 602 F.3d at 564–65 (holding that a "court should determine the appropriateness of an IEP as of the time it was made.")). That E.W. struggled to read and articulate and did not perform at grade level is exactly why the District sought to provide her with special education to help her progress in light of her own disability. Her regressions did not mean that the IEPs were inadequate, as the District modified the IEPs accordingly. *See K.D., ex rel. Dunn v. Downingtown Area Sch. Dist.*, 904 F.3d 248, 255 (3d Cir. 2018) (holding that a student's slow progress does not prove that an IEP was deficient), *see also Sean C. v. Oxford Area Sch. Dist.*, No. 16-5286, 2017 WL 3485880, at *4, *13–14 (E.D. Pa. Aug. 14, 2017) (finding that the school district provided a FAPE even though the student made "marginal" progress toward his IEP goals). The IEPs show she made progress toward her goals.

In sum, all three IEPs were reasonably calculated to provide E.W with a meaningful educational benefit.[17] The IEPs specifically addressed E.W's weaknesses in core academic classes, along with behavioral and social needs. Parent does not provide evidence to show that the IEPs were unreasonable; rather, the administrative record sufficiently supports the Hearing Officer's decision. Therefore, the Court, giving the requisite deference to the Hearing Officer's findings, similarly concludes that the IEPs provided E.W. with a FAPE.

### 3. E.W.'s 2024 IEPs provided her with a FAPE in the least restrictive environment (LRE).

At the outset, Parent's argument that the Hearing Officer did not complete an *Oberti* analysis, *see* Pl. Mot. 38, is without merit. The Hearing Officer explicitly considered the *Oberti* factors in rendering his decision. *See* H.O.D. 20. The Hearing Officer reviewed (1) the District's

---

[17]    Parent introduces two exhibits alongside her Motion: E.W.'s 2025 reevaluation report, *see* Ex. A, ECF No. 14-2, and E.W.'s 2025 IEP, *see* Ex. B, ECF No. 14-3. Parent maintains that both exhibits show that the 2024 IEPs were not reasonable because E.W. failed to meet her goals in her IEP. *See* Pl. Mot. at 42. This Court construes Parent's submission as a request for inclusion of additional evidence. *See A.Y. v. Cumberland Valley Sch. Dist.*, 569 F. Supp. 2d 496, 504–07 (M.D. Pa. 2008) (considering the submission of additional evidence with a motion for judgment on the administrative record as a request, in lieu of a formal motion). In deciding this request, the Court notes that subsequent IEPs are admissible to bear on the prior IEP's reasonableness, and a party need not re-exhaust administrative remedies. *See H.G. ex rel. Davis v. Sch. Dist. of Upper Dublin*, No. 13-1976, 2014 WL 8628601, at *21 (E.D. Pa. Oct. 17, 2014), *objections sustained in part and overruled in part sub nom. H.G. ex rel. Davis v. Upper Dublin Sch. Dist.*, No. 13-1976, 2015 WL 1808538 (E.D. Pa. Apr. 17, 2015). The Court finds that the exhibits bear "on the *reasonableness* of the [D]istrict's decision at the time it was made." *Susan N.*, 70 F.3d at 762. Specifically, the 2025 IEP and reevaluation report provide many of the same recommendations as the prior IEPs, including E.W.'s placement in the general education curriculum for 48% of the school day, *see* Ex. B. at 72, and her continued placement in special education and life skills courses, *see* Ex. A. at 60–63. The *Antoine M.* factors also favor admission. First, the District had not implemented the IEP or reevaluation report at the time of the due process hearing. *See Antoine M.*, 420 F. Supp. 2d. at 403. Second, the exhibits do not prejudice the District because the District prepared them. *See id.* Third, the exhibits are not cumulative because they did not exist at the time of the hearing. *See id.* Fourth and finally, the exhibits provide additional insight into the District's considerations regarding E.W.'s needs and abilities over time. *See id.* The Court admits Exhibits A and B. Having admitted Parent's additional exhibits, the Court finds that they support its conclusion that the IEPs provided E.W. a FAPE.

ability to implement supplementary aids and services in the general education classroom, (2) how the District evaluated E.W.'s progress in the regular education classroom, (3) the educational and social benefits provided to E.W., and (4) the disruptive effect E.W.'s participation had on her peers. *See id.* at 21–23. *Compare Oberti*, 995 F.2d at 1217–18 (listing the three factors as: (1) "whether the school district has made reasonable efforts to educate the student in a regular classroom;" (2) "the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, . . . ;" and (3) "the possible negative effects of the inclusion of the child on the education of the other students in the class"). The Hearing Officer concluded that the IEPs provided E.W. with the least restrictive environment when mainstreaming her with placement in the regular education classroom for 77% of the school day in fourth and fifth grade and (ultimately) 42% of the school day in sixth grade. *See id.* at 23. The Court agrees.

Regarding the first part of the *Oberti* test, the District included E.W. in the general education classroom with supplemental aids and services. Such supplementary aids included "sensory tools," "use of paraprofessional support," "hands-on instruction," and "use of a visual schedule." Ex. S-10 at 46–47. The District reasoned that the general education class could assist E.W. in learning social skills, while "[t]he special education class [would] provide access to fast paced instruction with dense reinforcement in a small group environment with limited distractions and a focus on skills at [her] educational level." *Id.* at 46. The District found that the benefits of the special education class included "staff to student ratio, ability to provide her with individualized modified instructions, familiar routines and schedules, increased structure, and fast paced instruction with dense reinforcement." *Id.* The District considered discrete supplementary services to assist E.W. in participating in the general education class but

34
021726

concluded that she would benefit from more time in the special education classroom. Parent's argument that the District did not consider providing E.W. with supplementary aids and services is thus without merit.

In accordance with the first *Oberti* factor, the Court finds that the District consistently made reasonable efforts to accommodate E.W. in the general education classroom. Each year of E.W.'s education, the District sought to include her in the general education classroom. Yet, E.W. "struggled to participate in whole-group settings and required near-constant 1:1 attention." H.O.D. 21. In fifth grade, E.W. spent almost three-quarters of the school day in her general education classroom, and her teacher modified the curriculum to E.W.'s level and worked directly with E.W., although E.W. struggled to pay attention. *See* N.T. 157–58, 171–76, 191–200; *see also* Ex. S-10 at 17. In sixth grade, while the District reduced the amount of time E.W. spent in the general education classroom, she still took science, social studies, and specials like art, music, and physical education with her general education peers. *See generally* Ex. S-10, S-15. The District struck a balance where E.W. would participate in the general education class alongside the special education class. Rather than "deny her the ability to be involved and progress in the general education curriculum," *see* Pl. Mot. 39, the District made reasonable accommodations to modify the curriculum to E.W.'s level. Through each relevant year of school, the "District has expended substantial time and effort to provide [E.W.] with a meaningful benefit from inclusion in the regular classroom." *Greenwood v. Wissahickon Sch. Dist.*, 571 F. Supp. 2d 654, 664 (E.D. Pa. 2008), *aff'd sub nom. A.G. ex rel. S.G. v. Wissahickon Sch. Dist.*, 374 F. App'x 330 (3d Cir. 2010) (upholding a hearing officer's decision that the district provided the student with the least restrictive environment where the district included the student in general

education classes, although she likewise had a short attention span and required one-on-one instruction).

Parent's argument that the District could include E.W. in the general education curriculum for the entire school day, *see* Pl. Reply 4, is without merit. In support of her argument, Parent cites Mr. McCracken's testimony that E.W. could participate in the general education science class. *See* N.T. 510-11, 519–20. However, E.W.'s ability to participate in one general education class, in which the District already placed her, does not make the District's decision to place her in special education for ELA and Math unreasonable. Rather, Mr. McCracken's science class is an example of how the District included E.W. in the general education curriculum. Learning such core skills in the special education classroom could assist E.W. in her other general education classes. Parent fails to show that the District's ability to include E.W. in some general education classes means her placement in special education for ELA and Math was unreasonable.

The record shows that the District expended substantial time and effort to include E.W. in the general education classroom. Still, the record reveals that E.W. required specialized one-on-one education and needed additional time spent on her core subjects that she would not otherwise receive in the general education course.

Regarding the second *Oberti* factor, the educational benefit to E.W. of remaining in the general education class for ELA and Math is low. Her test scores placed her below the 0.1 percentile in both ELA and Math, meaning she required additional help in both subjects. *See* Ex. S-14 at 16–17. Including her in the general education ELA and Math classes, even with modifications, would foreclose E.W. from learning fundamental core education in both subjects. Reciprocally, the special education curriculum provided E.W. with a structured environment to

match her attention span. E.W. has a twenty-minute attention span, *see* N.T. 541–42, so education in the general education setting for longer block periods did not benefit her. Placing E.W. in a smaller special education class for her core subjects permitted the instructor to design a curriculum for E.W. at E.W.'s needed pace, which would reduce distractions and strengthen implementation of the curriculum. The Court finds that E.W. received a greater educational benefit from the special education classroom. *See Greenwood*, 571 F. Supp. 2d at 666 ("[i]n order to accommodate [the student's] cognitive limitations and abilities, the [s]chool [d]istrict must modify her regular education program to such an extent that it effectively constitutes a totally different curriculum, thus defeating the purpose of [her] inclusion in regular class.").

Similarly, E.W. received little social benefit from the general education classroom. She did not always interact with her classmates in the general education classroom but could play respectfully with her classmates in the life skills support classroom. *See* Ex. S-10 at 7. She also did not generally eat lunch with her general education peers, preferring to eat lunch with her paraprofessional, in an area away from her peers. *See id.* Additional time in the life skills support classroom would provide E.W. with the opportunity to interact with her peers on a one-on-one basis. A smaller environment would assist E.W. in developing her social skills.

As another part of her social benefit, E.W. required life skills support. Many of the life skills E.W. must learn, including self-care, could not be taught in a general education classroom. E.W. needed additional help with everyday activities, including brushing her hair and washing her hands, which she would not otherwise learn in the general education curriculum. *See* Ex. S-10 at 5–6. While these skills are necessary for E.W., many students in the general education class do not have the same needs. Additional inclusion in the general education classroom "would

hinder [E.W.'s] own progress in acquiring essential life skills." *Greenwood*, 571 F. Supp. 2d at 667.

As to the third *Oberti* factor, E.W. frequently disrupted the regular classroom, adversely affecting her peers. The Hearing Officer noted that E.W. has a "disruptive impact on the learning environment." H.O.D. 23. The Hearing Officer also cited how "teacher testimony and observational data confirm that [E.W.'s] presence in a large-group setting required disproportionate instructional resources, impacting both "E.W.'s learning and that of peers." *Id.* 22. Further, E.W's "difficulty with group participation and reliance on constant adult support further justifies a placement for a limited time of day in a classroom that includes specialized instruction." *Id.* The Court agrees. *See* N.T. 195 (Ms. Braca testified that E.W. engaged in disruptive behaviors, including "yelling, moving around, sitting in other students' seats while they were on the back carpet [for reading time]."); N.T. 463–64 (Ms. Herbine testified that E.W. engaged in loud vocalizations, cursing, hiding under a counter, and hitting or spitting at her paraprofessional.). Parent presents no evidence to the contrary, but instead presents E.W.'s daily progress reports, which show her disruptive behavior. *See* Ex. P-2. While E.W.'s disruptions are "not dispositive" of her placement, when considered alongside her other needs, her disruptions necessitated placement in the special education class. *H.G. ex rel. Davis v. Sch. Dist. of Upper Dublin*, No. 13-1976, 2014 WL 8628601, at *16 (E.D. Pa. Oct. 17, 2014), *objections sustained in part and overruled in part sub nom. H.G. ex rel. Davis v. Upper Dublin Sch. Dist.*, No. 13-1976, 2015 WL 1808538 (E.D. Pa. Apr. 17, 2015) (finding that the third *Oberti* factor is not dispositive, but merits consideration in whether education in the general education class is feasible).

With regard to the second part of the *Oberti* test, the District included E.W. "in school programs with nondisabled children whenever possible." *Oberti*, 995 F.2d at 1215. Although the

proposed May 2024 IEP initially placed E.W. in a life skills class for part of the day, the District

determined that E.W. could obtain meaningful educational benefit in the general education

science class, with supplementary aids and services. E.W. also had lunch, specials like art and

music, and other extracurricular activities with her general education classmates. *See* Ex. S-10 at

8. Furthermore, the District revised the IEP to include her general education social studies class.

*See* Ex. S-15. E.W.'s 2024 placements directly sought to integrate her with her general education

peers to the maximum extent appropriate. The Court finds that the 2024 IEPs provided E.W. with

a free, appropriate public education in the least restrictive environment. [18]

The Court affirms the Hearing Officer's decision that the District provided E.W. with a

FAPE; therefore, the Court will not award compensatory education.

### 4.  ADA and Section 504 Discrimination

The parties only dispute whether the District denied E.W. the benefits of her program or

was otherwise subject to discrimination.

First, Parent's discrimination by placement claim fails. Parent offers no additional

evidence of discrimination but merely repeats the same arguments as her denial of FAPE claim.

For the reasons discussed above, the District provided E.W. with a FAPE, and did not

---

[18]    Parent argues that the Hearing Officer failed to conduct a separate Section 504 FAPE
analysis. Her argument is without merit because the Hearing Officer explicitly conducted a
Section 504 FAPE analysis. *See* H.O.D. 24–27. Upon *de novo* review, the Court agrees with the
Hearing Officer. Parent does not offer any additional evidence in support of her Section 504
claim but merely relies on the same evidence presented in her IDEA claim. *See D.K.*, 696 F.3d at
253 (holding that a failure to prove an IDEA violation necessarily results in a failure to prove a
Section 504 violation unless the parties present evidence of disability-based discrimination or
failure to provide reasonable accommodations). For the reasons set forth in the Court's IDEA
analysis, the Court concludes that the District provided E.W. with a FAPE under Section 504 for
the 2022-23, 202-24, and 2024-25 school years. *See J.M.*, 39 F.4th at 147 (holding that a separate
Section 504 analysis is not necessary when the party raises no additional evidence in support of a
Section 504 claim); *see also B.S.M.*, 103 F.4th at 965 (affirming the holding in *J.M.* for cases
where the party does not present additonal evidence in support of a Section 504 claim).

discriminate against E.W. by providing her with special education. *See J.M.*, 39 F.4th at 147 (noting that when a party presents no new facts to distinguish a Section 504 claim—analyzed the same as an ADA claim—from an IDEA claim, no additional analysis is necessary).

Second, contrary to Parent's argument that the District failed to contemplate evaluating E.W. for augmentive communication services, Pl. Mot. 58, the evidence shows the District conducted an assistive technology evaluation in 2021 and recommended against using a communication device. *See* Ex. S-4 at 12–14. E.W.'s 2022 Reevaluation Report found E.W. did not need an "augmentive communication device" because she could "sustain attention, follow directions, [and was] willing[] to participate." Ex. S-4 at 14. Thus, there is no genuine issue of material fact regarding whether the District ever contemplated testing E.W. for an augmentive communicative device.

As to Parent's third argument, *see* Pl. Mot. 58, Parent cites no evidence showing that the District failed to analyze why E.W.'s speech was not "more understandable" following speech therapy. She does, however, cite Dr. Rufo's expert report suggesting that the District's speech therapy methodology is not effective. *See* Ex. P-16. Regardless, the District points to the November 2024 IEP, which provided numerous program modifications for speech therapy, and increased E.W.'s time in speech therapy. *See* Ex. S-15 at 35–38. This evidence shows that the District analyzed why E.W.'s speech therapy was not working and took additional steps to increase its effectiveness. Dr. Rufo's mere disagreement with the District's methodology is insufficient to create a genuine dispute of material fact. *See Alexander G.*, 2021 WL 1614400, at *6–7 (concluding that parental disagreement with a school district's methodology does not mean the school failed to provide a FAPE). Absent additional evidence, the Court finds "no reasonable jury" could find that the District discriminated against E.W. *J.R.B. v. Quakertown Cmty. Sch.*

40
021726

*Dist.*, No. 23-373, 2024 WL 3327938, at \*9 (E.D. Pa. July 8, 2024), *aff'd in part, vacated in part, remanded,* No. 24-2308, 2025 WL 1218253 (3d Cir. Apr. 28, 2025) (denying an ADA discrimination claim for failing to produce evidence of discrimination).

The Court grants summary judgment to the District on the Section 504 and ADA discrimination claims.

## V.      CONCLUSION

For the foregoing reasons, this Court affirms the Hearing Officer's decision. The Court agrees with the Hearing Officer that the District did not violate the IDEA or Section 504. The Hearing Officer correctly determined that the District provided E.W. with a free, appropriate public education in the least restrictive environment. As a result, the District did not discriminate against E.W. by her placement. The Section 504 and ADA discrimination claims are therefore also without merit. This Court grants the District's Motion for Summary Judgment and denies Parent's Motion for Judgment on the Administrative Record.

A separate Order is issued.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge